IN THE UNITED STATES DISTRICT COURT
FOR THE NORTER DISTRICT OF OHIO

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF INFORMATION ASSOCIATED WITH THE CELLULAR DEVICE ASSIGNED CALL NUMBER 216-312-7043, THAT IS STORED AT PREMISES CONTROLLED BY T-MOBILE USA, INC | Case No. __1:19mj3126__<br><br>**Filed Under Seal** |

**AFFIDAVIT IN SUPPORT OF**
**AN APPLICATION FOR A SEARCH WARRANT**

I, Todd Springer, being first duly sworn, hereby depose and state as follows:

**INTRODUCTION AND AGENT BACKGROUND**

1.  I make this affidavit in support of an application for a search warrant for information associated with a certain cellular telephone assigned call number 216-312-7043, ("the **SUBJECT PHONE**"), that is stored at premises controlled by T-MOBILE USA, INC ("T-MOBILE"), a wireless telephone service provider headquartered at 4 Sylvan Way, Parsippany, NJ 07054.  The information to be searched is described in the following paragraphs and in Attachment A.  This affidavit is made in support of an application for a search warrant under 18 U.S.C. § 2703(c)(1)(A) to require T-MOBILE to disclose to the government copies of the information further described in Section I of Attachment B.  Upon receipt of the information described in Section I of Attachment B, government-authorized persons will review the information to locate items described in Section II of Attachment B.

1.  I am a Special Agent with the Department of Veterans Affairs, Office of Inspector General, Criminal Investigations Division ("VA OIG"), and have been since July 2010.  I have been a Federal agent since May 2001, having previously served as an agent with the Internal Revenue Service, Criminal Investigations and U.S. Postal Service, and completed the Federal Law Enforcement Training Center's Criminal Investigator Program.  I am currently employed at

the VA OIG Cleveland Resident Agency Office, located in Cleveland, Ohio. The VA OIG is charged with the responsibility of conducting investigations relating to the programs and operations of the United States Department of Veterans Affairs ("VA"), including drug distribution, theft, fraud and public corruption. Based upon my training, experience, and participation in these types of investigations, I am familiar with the techniques used by persons engaged in fraudulent and other related criminal activity. Since joining the VA OIG, I have investigated violations of federal law in white collar crime, health care crimes, drug crimes and computer crimes. I have been involved in the execution of numerous search warrants, including warrants involving the collection of controlled substances. I have gained experience through training in seminars, classes, and everyday work related to conducting these types of investigations.

2. The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

3. Based on the facts set forth in this affidavit, there is probable cause to believe that violations of 21 U.S.C. § 841(a)(1), Distribution of Controlled Substances, have been committed by BOBBI JO BOYLAN ("BOYLAN"), LISA GOFORTH ("GOFORTH") and others. There is also probable cause to search the information described in Attachment A for evidence, instrumentalities, contraband, or fruits of these crimes as further described in Attachment B.

## PROBABLE CAUSE

4. Based on my training and experience, and based upon the facts detailed in this Affidavit, there is probable cause to believe there are fruits, evidence and instrumentalities of

criminal offenses against the United States, namely Title 21 United States Code § 841(a)(1), Distribution of Controlled Substances.

5. Specifically, based on my based on my training and experience and the facts as set forth in this affidavit, there is probable cause to believe that BOYLAN, GOFORTH and others distributed heroin and/or fentanyl to veteran with the initials T.M. at the Cleveland VA Medical Center ("VAMC") on March 1, 2019, with the use of the **SUBJECT PHONE**.

6. The Department of Veterans Affairs is an agency of the U.S. Government that provides benefits to United States military veterans discharged from active duty under other than dishonorable conditions. The Cleveland VAMC's main campus is located at 10701 East Blvd., Cleveland, OH, 44106.

7. VA records revealed T.M. served in the U.S. Navy from October 7, 1986 to March 1, 1990, and again from January 17, 1991 to August 8, 1991. T.M. received honorable discharges after both periods of service. T.M. is 80% service connected due to disabilities she incurred as a result of her military service. In addition, based on her service connected disabilities, the VA determined T.M. is individually unemployable and therefore receives a total disability rating. T.M. was an inpatient at the Cleveland VAMC on March 1, 2019 due to a recent back surgery.

8. This investigation is being worked jointly with the Federal Bureau of Investigation Northern Ohio Law Enforcement Task Force in Cleveland, OH.

9. On March 1, 2019, T.M. overdosed on suspected heroin and/or fentanyl while an inpatient at the Cleveland VAMC. Nursing Assistant Megan Fenyes ("Fenyes") was conducting her rounds and went into T.M.'s patient room. Fenyes called for T.M., but she did not respond. Fenyes located T.M. in the bathroom inside of her hospital room slumped halfway off her toilet

with her face under the bathroom rail. T.M.'s right hand was in her lap and her left hand was hanging down. Fenyes attempted to wake up T.M. , but she was not responsive. Fenyes called for other staff and was instructed to pull the alarm.

10. On March 1, 2019, Nurse Brian Hermann ("Hermann") was notified by Fenyes that T.M. was unresponsive in the bathroom of her patient room. Hermann responded to T.M.'s room and saw T.M. slumped over sitting on the toilet with a cigarette butt hanging out of her mouth. Hermann tried to help T.M. regain consciousness by shaking her and administering sternum rubs and instructed Fenyes to sound the alarm for help. After help arrived Herman observed a silver spoon and syringe next to T.M. on her bathroom sink counter. Herman removed the items from the sink counter so staff could safely provide care to T.M. T.M. eventually regained consciousness, so T.M.'s physician decided to immediately transfer T.M. to the Emergency Department instead of administering medication. After regaining consciousness T.M. told medical staff she injected heroin directly into her peripherally inserted central catheter (PICC).

11. On March 1, 2019, the Cleveland VAMC Police ("VAPD") took photographs of the bathroom inside of T.M.'s patient room, collected the spoon, syringe and packaging containing reddish/white colored substance of suspected heroin/fentanyl, and then placed the contraband in evidence. On March 11, 2019, these items were secured in evidence in the VA OIG Cleveland Office evidence room.

12. On March 2, 2019, T.M. was initially interviewed by Lieutenant Kathleen Schindler with the VAPD. T.M. told Lt. Schindler she is a recovering heroin addict but had not used heroin in approximately two years. T.M. was in the VA hospital for approximately four (4) weeks after having back surgery and then returned due to an infection. T.M. received pain

medication for several weeks, but it was stopped by medical staff and she was in extreme pain. T.M. claimed she purchased the heroin from an unidentified white male near the hot dog stand outside of the Cleveland VAMC.

13. On March 3, 2019, VAPD was notified by VAMC medical staff that a syringe and multiple candy wrappers were found in T.M.'s possession in her hospital room. VAMC staff told the VAPD that T.M. was visited by an unidentified white male and three unidentified white females. T.M. told VAMC staff the male was her stepson. The nurse assigned to monitor T.M. noticed the male placed a pink "Sweetarts Ropes" candy box in T.M.'s dresser. After the male left the room, T.M. went to the dresser drawer and retrieved the candy box. The nurse saw T.M. place items in her groin area under the covers, and when she ultimately confronted T.M. , she turned over several candy wrappers and a syringe. A search of the candy wrappers recovered by VAPD revealed a piece of paper with brown residue.

14. On March 3, 2019, I was contacted by the VAPD and responded to the Cleveland VAMC. Lt. Schindler and I interviewed T.M. in her patient room at the Cleveland VAMC. At first T.M. claimed an unidentified white male she met on the street near the hot dog stand sold her the heroin that caused her to overdose on March 1, 2019. However, T.M. ultimately admitted she purchased the heroin on March 1, 2019, from BOYLAN after meeting her in a vehicle located in the Cleveland VAMC patient drop off area. BOYLAN was in the rear driver's side seat, BOYLAN's girlfriend, GOFORTH, was in the front passenger seat, and an unidentified white male was driving the vehicle. T.M. entered the rear passenger door, purchased the heroin from BOYLAN, and was then dropped off at the Cleveland VAMC CARES Tower entrance. T.M. called and texted BOYLAN at telephone number 216-312-7043 (hereinafter **SUBJECT PHONE**) on March 1, 2019, to arrange for the heroin transaction at the

5

Cleveland VAMC.  T.M. entered the VAMC and ultimately used the heroin she purchased from BOYLAN in the bathroom located inside of her patient room by injecting it through her PICC.  T.M. was introduced to BOYLAN in approximately February 2018, and BOYLAN previously lived with T.M. for a short period of time at her apartment in Lakewood, OH.  T.M. purchased heroin on one other occasion from BOYLAN at her apartment in Lakewood, OH prior to her admission to the VAMC.

15. A review of surveillance video at the Cleveland VAMC revealed on March 1, 2019, at approximately 1:30 p.m. T.M. entered the rear passenger door of a black Nissan Altima bearing Ohio License Plate HMG 6017, which is registered to CRAIG BOOTHE JR ("BOOTHE"), in the Cleveland VAMC Atrium entrance drive.  At approximately 1:34 p.m. T.M. exited the rear passenger door of the Nissan Altima at the Cleveland VAMC CARES Tower entrance and then entered the Cleveland VAMC.  During a subsequent interview, T.M. reviewed an Ohio identification card photograph of BOOTHE and stated he resembled the male driving the black Nissan Altima on March 1, 2019, but she was not able to positively identify him as the driver.  T.M. positively identified BOYLAN and GOFORTH from their Ohio identification card photographs.

16. On March 4, 2019, T.M. stated she was willing to make consensually monitored telephone calls to BOYLAN on the **SUBJECT PHONE**, the number she used to call BOYLAN on March 1, 2019 to set up the heroin transaction at the Cleveland VAMC.  T.M. signed an OIG consent to monitor conversations form as well as an OIG consent search form allowing the search of her Samsung Galaxy cell phone.

6

17.     On March 4, 2019, T.M. made a consensually monitored telephone call to BOYLAN on the **SUBJECT PHONE**.  T.M. informed BOYLAN she overdosed, and BOYLAN asked if "they found it and took it" and stated "they're going to be watching you now."

18.     On March 5, 2019, T.M. made another consensually monitored telephone call to BOYLAN on the **SUBJECT PHONE**.  During the call, T.M. stated she was able to find "it" because she hid "it" well and asked BOYLAN how much she could safely "pinch."  BOYLAN told T.M. maybe a "5-10."  T.M. told BOYLAN she did maybe a "10 or a 20 and I was out."  BOYLAN told T.M. to not do a "whole 20" but just between "5 and 10."  BOYLAN then told T.M. "I've got some new shit that's purple that I'd be scared to let you try."  T.M. then told BOYLAN she used her PICC line to inject the heroin, and BOYLAN told T.M. to "do it somewhere else and not the PICC line."  BOYLAN then stated, "The PICC line is what did it because it's going straight to your heart."  BOYLAN then stated, "You need to just snort it [T.M.] . . . snort it, that's all you need to do is snort it, because they're going to be watching you for a minute . . . so just sniff it."  BOYLAN then stated, "I knew something happened . . . I just felt it in my heart."  When T.M. asked BOYLAN if what she sold her was mostly fentanyl or what does she think it is, BOYLAN stated, "It's fentanyl, yeah" and then stated "I'm not going to keep talking about that, but be careful with whatever you're doing."

19.     On March 9, 2019, T.M. forwarded me additional texts she received from BOYLAN.  During the text message chain on March 9, 2019, BOYLAN stated to T.M., in addition to asking how she was doing, "Hey we got some new stuff finally that's better than red," to which T.M. replied, "Got a tiny bit of the red still . . . I really needed to that (sic) in tiny doses . . . I can not (sic) believe that shit happened . . . Ive (sic) only od'd one (sic) and that was in 11."  BOYLAN then texted to T.M. "I'll trade you if u want some different."  T.M. then

7

stated, "I may hit you up when he's gone," to which BOYLAN stated, "It's ok it happens be grateful ur Alive (sic)."

20. BOYLAN was previously convicted in Cuyahoga County Common Pleas Court on drug trafficking offenses and received a two- and half-year prison sentence. BOYLAN currently has an outstanding felony arrest warrant from Cuyahoga County for receiving stolen property.

21. On March 26, 2019, I served a Search and Seizure Warrant issued by the United States District Court for the Northern District of Ohio on SPRINT PCS ("SPRINT) for records related to assigned call number 216-312-7043. On March 27, 2019, SPRINT provided records pursuant to the search warrant, which showed the account was opened under the name "MARIAH WEAVER", 4341 Rocky River Drive, Cleveland, OH 44135, on March 1, 2019, at approximately 6:45 p.m. The records obtained from SPRINT did not cover the above described transaction between T.M. and BOYLAN at the Cleveland VAMC, which video surveillance showed occurred on March 1, 2019, at approximately 1:30 p.m. I searched various publicly available online databases which revealed call number 216-312-7043 was previously held by T-MOBILE.

22. In my training and experience, I have learned that T-MOBILE is a company that provides cellular telephone access to the general public. I also know that providers of cellular telephone service have technical capabilities that allow them to collect and generate information about the locations of the cellular telephones to which they provide service, including cell-site data, also known as "tower/face information" or "cell tower/sector records." Cell-site data identifies the "cell towers" (i.e., antenna towers covering specific geographic areas) that received a radio signal from the cellular telephone and, in some cases, the "sector" (i.e., faces of the

8

towers) to which the telephone connected. These towers are often a half-mile or more apart, even in urban areas, and can be 10 or more miles apart in rural areas. Furthermore, the tower closest to a wireless device does not necessarily serve every call made to or from that device. Accordingly, cell-site data provides an approximate location of the cellular telephone but is typically less precise than other types of location information, such as E-911 Phase II data or Global Positioning Device ("GPS") data.

23. Based on my training and experience, I know that T-MOBILE can collect cell-site data about the **SUBJECT PHONE**. I also know that wireless providers such as T-MOBILE typically collect and retain cell-site data pertaining to cellular phones to which they provide service in their normal course of business in order to use this information for various business-related purposes.

24. Based on my training and experience, I know that wireless providers such as T-MOBILE typically collect and retain information about their subscribers in their normal course of business. This information can include basic personal information about the subscriber, such as name and address, and the method(s) of payment (such as credit card account number) provided by the subscriber to pay for wireless telephone service. I also know that wireless providers such as T-MOBILE typically collect and retain information about their subscribers' use of the wireless service, such as records about calls or other communications sent or received by a particular phone and other transactional records, in their normal course of business. In my training and experience, this information may constitute evidence of the crimes under investigation because the information can be used to identify the **SUBJECT PHONE** user or users and may assist in the identification of co-conspirators and/or victims.

## AUTHORIZATION REQUEST

25. Based on the foregoing, I request that the Court issue the proposed search warrant, pursuant to 18 U.S.C. § 2703(c) and Federal Rule of Criminal Procedure 41.

26. I further request that the Court direct T-MOBILE to disclose to the government any information described in Section I of Attachment B that is within its possession, custody, or control. Because the warrant will be served on T-MOBILE, who will then compile the requested records at a time convenient to it, reasonable cause exists to permit the execution of the requested warrant at any time in the day or night.

27. I further request that the Court order that all papers in support of this application, including the affidavit and search warrant, be sealed until further order of the Court. These documents discuss an ongoing criminal investigation that is neither public nor known to all of the targets of the investigation. Accordingly, there is good cause to seal these documents because their premature disclosure may seriously jeopardize that investigation, including by giving targets an opportunity to destroy or tamper with evidence, change patterns of behavior, notify confederates, and flee from prosecution.

Respectfully submitted,

Todd Springer
Special Agent
VA OIG

Sworn to via telephone after submission by reliable electronic means. Crim.Rules. 4.1; 41(d)(3)

Thomas M. Parker
United States Magistrate Judge
**2:15 PM, Apr 16, 2019**